May I please the court, and thank you very much for taking the time to read the briefs and to consider the argument. Fundamentally, this is a credit reporting case. It's not a billing case. When we read the language from the district court decision, quote, Peters does not allege that Discover claims more than the amount Peters admits he made in legitimate charges. It sounds like the district court is looking at this as some kind of billing case. Your Honors, if Mr. Peters, you know, legitimately can dispute a $1 debt, or if he does not owe that dollar and Discover is reporting him as delinquent on that dollar, that's a credit reporting dispute. It's not a billing dispute. If you were required to say in one sentence what it is that Discover did that he's entitled to recover for, what would that sentence be? Oh, that would, that's, and I'll try, I'll do my best, Your Honor. I probably didn't polish that sentence before I came down here. You were. No, I'll tell you, they did not do a reinvestigation as required by Gorman. They did not follow the mandates, semicolon, since we're staying within one sentence. They did not stay within the confines of the California Identity Theft Law by taking the debit offsets, the money that they had to pay back, that Discover had to pay back to Bank of America, and putting it back onto Mr. Peters' bill. Now, that is where the, perhaps the plainest expression in your brief is, or something that they may have done illegally, is that since they reported him being a high balance and an excess balance based on what they did in that transaction. Yeah. And, Your Honor, Justice Suntell, I apologize. I appreciate the promotion. It may be different in D.C. Circuit, but there's no justice on the Ninth Circuit. Anything to be beyond the trial court. You can take it however you want. Okay. Your Honor, we also have, I mean, the key evidence that we have here is from Mr. Jacks, the internal employee at Discover. I mean, we did our work in this case. You know, Mr. Toffer and Discover Bank respectfully cite a bunch of pro per cases where they didn't do the work. We did the work. We've got the statement from Mr. Jacks that he tries to go through the accounting, and he says, you know, it's, you know, he doesn't know, you know, whether interest was properly applied. He doesn't know, you know, where the debits were being applied for Discover, you know, taken away and pulled back and so forth. He doesn't know these things. So, therefore, the proper thing to do because it was an unverifiable account under the Fair Credit Reporting Act was to not report. Counsel, let's go ahead. Go ahead. No, no, you know, this is an unusual case, you would admit. But don't you have the problems, when we look at what Discover Bank would have known and what your client could have known, who's in a better position to find out that somebody is doing something mischievous to their account? Well, I got about a two- or a three-step analysis on that one. Number one, that's a comparative negligence analysis. That's not a summary judgment issue. I'm not suggesting that it's comparative negligence or anything else, but there's no doubt that Discover Bank had records and it had certain knowledge. Right. There's no doubt that your client could have had certain knowledge, but he didn't have. In fact, the one thing that this record shows he knew, he knew there was a legitimate charge that he didn't pay. No. He, remember, number one is Discover Bank told Mary Peters not to pay. This is not a situation where he knew he had a legitimate charge. Well, they didn't tell him not to pay that charge. They told him not to pay anything until they concluded the fraud investigation. Right. And that was during the period of time after that he initiated the investigation. So he's following Discover's statement, don't pay, and then suddenly we're here in the Ninth Circuit because he didn't pay. Counsel, let me see if I can distill at least what I understand. Tell me if I'm wrong. Sure. You have the issue of what the law is. And in our circuit perhaps not so clear as to who has the burden that my colleague just referred to, who is in a better position to know. But once you get past that, you've got a bunch of summary judgments that the trial court entered where there was clearly conflicting, perhaps materially conflicting evidence. I gather what you're saying is we need to get some clarification on who has the burden, who's in a better position to know, and we want you to reverse all these summary judgments because you've got material conflicting evidence. We need to go back for trial. Is that basically what you're saying? I want you to reverse the summary judgment on this case, and I want to tell you why. And I think that I answered your question and your concern. And please, if I don't, please tell me. Have some water. It's not spiked, Your Honor. Okay. This is an identity theft case. We've got a situation here where, I mean, let's say we have a clever clerk back in chambers, and she falsifies your bench briefs. You walk out here and you have bench briefs which state the opposite of what your intended or your anticipated ruling was going to be. How are you going to know? Mr. Peters, the question is, and it's a good question, was Mr. Peters negligent? I would submit to you, number one, that at most he was comparatively negligent, but, number two, I'll go a step further, he was not negligent. That's rather hard to defend. Oh, no, I'll do it right now. It was his credit. He let somebody else use it, and they embezzled it. He had a person in his office who was falsifying the statements from Discover Bank to conceal from him the activity on that account. He had a person in his office who was taking the checks. How long did this go on? It went on for several years. Was that Discover Bank's fault? Remember, this is a credit reporting case. I understand that. Let's get to how we got there in the first place. All right. Okay, I will tell you something. And, again, this is a good question. This is differentiating the billing dispute from the credit reporting dispute. From the billing dispute point of view, that is a question of fact. Discover Bank has brought before you law and a position that they say that it is Mr. Peter's fault. We contend it was Discover Bank's fault based on evidence, including statements from Discover's own employee. But as soon as you recognize this is an identity theft situation, as soon as you recognize that the billing amounts and the credit reporting was never verified, it was unverified under the Fair Credit Reporting Act, then we move over into what the real dispute in this case is, a credit reporting dispute, and Discover did not have a right to credit report if they didn't know what the true balance was. Well, counsel, again, I think you overstate your case here. Your client, arguably, at least clothed this person that worked for him with ostensible authority, if not actual authority, to do what she did. Now, he didn't condone it, but he's responsible for that. The bank then entered into negotiations with your client, initially made a substantial credit to the account. Thereafter, it gets messy. Your client, under the record, spent more money. There were more charges. On the same account? On the same account. So then you've got this issue of who owes what, where. Yeah, there were some things that came back one way, your client said the other. So you've got material issues of fact. Clearly, there were some screw-ups on both sides. And that's really what we're dealing with right now. It's not one way, either way. That's why I say it seems to me that summary judgment probably is a little difficult in this case because the facts are in dispute. And ultimately, whether or not there is an identity theft violation here in part depends on what law applies and how it applies, but then you get into these summary judgments. Why is that wrong? Why is that analysis wrong? Your Honor, if you're going to say that there are factual disputes and summary judgment is not appropriate and this case should be remanded to the district court, I'm not saying that's wrong. Okay. No, believe me. If I come down to Pasadena for that result, that's been a good day to Pasadena. But I would want to point out the Gorman standard. Remember, Gorman is a Ninth Circuit decision that governs this case and is what I might call the seminal case in this district. And this is cited on page 42 of the appellant's opening brief. What the court, what the Ninth Circuit was doing in that case was analyzing what is and what is not a reasonable investigation under the Fair Credit Reporting Act. And this is quote. This is on page 1159 of Gorman. This is a case of MBNA. Verified that the account history was being reported. Matched the account history and MBNA's record, including the balance, the amount due, the high credit and the credit limit for the account. See, all these things that were done in Gorman that this circuit is saying is a reasonable investigation. We're not done here. All we have is. Is Gorman's report to be saying what has to be done or simply what was done in that case? I believe that what Gorman was saying is that if it meets this threshold, then you have a reasonable reinvestigation. They can't do that. That is different from saying if it doesn't meet this threshold, you don't have it. Your Honor, I disagree on that one, Your Honor. What you stated is not in disagreement with what I said. That question that I'm asking you is, is Gorman stating what has to be or is it stating what's enough in that case? I don't know that Gorman is saying that this is necessarily the be-all and end-all. I am saying that Gorman. They're saying it's sufficient. That's not the same thing as saying it's necessary. Yes. I would agree with that, Your Honor. However, we have a situation here where Ms. Missioni, the discover witness, comes in and says there's a ballpark. We have a situation here where we have varying account balances being reported as delinquent. And I do want to point out something, which I think is very important. Discover makes a big deal about the fact that they credited the account $16,000 following their investigation. What they don't mention is that they debited the account $14,500. I mean, in short, they were giving and they were taking away at the same time, and they were also doing the debit offsets, the money they had to pay over to Bank of America. But doesn't that get back to what Judge Santel just said? Gorman doesn't tell exactly what has to be done. He said it was what was done in that case. It didn't meet standard. But in this case, you've got material issues of fact. You've got the bank doing one thing, the bank doing another, your client doing something. It's just all over the place. And his wife doing something else. And his wife not knowing whether certain charges were legitimate or not and changing her story on whether they were legitimate. I think Ms. Peters is the most consistent witness in this case. I sat through this case. And I think that the record will show that if you go through it. But, I mean, I will say this. And, you know, with respect, if we take the Gorman standard in this decision and we lower it down, we're really, really harming consumers. We're really saying that banks can give a ballpark estimate of what is owed, and that will justify negative credit reporting. The problem that we're dealing with here is people's reputation. You know, if banks can come in and basically say, you know, we think you owe something around $100, so therefore we're going to report you as delinquent. But, counsel, again, if this were a perfect world, you'd be absolutely right. But this is a moving target. Your client's spending more money while this thing is in dispute. The bank's doing something on the other side. It's just moving, moving, moving. And it's not black and white. And this is why I'm saying I'm not sure this is a proper subject for summary judgment. Somebody has to figure out the facts and weigh it appropriately, but it's not clear in my judgment at this point whether there was a violation. Because if you have just one charge and the bank fraudulently puts up there a statement, this person owes X thousands of dollars and there's absolutely no basis for it, then that's one thing. But on the other hand, you've got charges that are continuing. Something is owed. Even your client admits something is owed. The question is how much, when, what was appropriate. The thing was still under investigation. And I think the law permits the bank to investigate. Your client has to be of assistance. And basically that's what we're dealing with here, how that worked as it went along. I do want to reserve just a brief moment for rebuttal. I do want to say that there is a bright-line violation here, and that is the debit offset, putting back onto Mr. Peters' account money that they had to pay to Bank of America for the identity theft charges. That is a clear violation of the California identity theft law. Do you have your point? A salient fact about that is they reported that as if that money were owed at a time when it's still in dispute. Correct, Your Honor. Okay. Good morning, Your Honors. Jared Topher on behalf of Discover Bank. Judge Smith, I'd like to address one of the questions that you raised or one of the issues that you raised, which is, is this case proper for summary judgment? I want to tell you why it absolutely is. What happened here is that once Discover learned of this identity theft situation, as they call it, in 2010, after it had been ongoing for six years, Discover Bank said, okay, give us a police report, tell us what you dispute, and we're going to try to address it. That process went on for two years. And during that process, Discover wrote off over $16,000 in charges, beyond what it was legally obligated to do, because as of 2010, when it was reported to Discover, you go back three months from that, and the amount that was on those credit cards was roughly $7,500. So Discover actually credited more than it was required to, because Mr. Peters had never come forward and told them that all these prior charges dating back to 2006 were unauthorized. Instead, what he did from 2006 to 2010, got billing statements from both his bank and Discover Bank, had the opportunity to review them, testified that had he actually reviewed them, he would have immediately discovered this fraud, and he never reported it, thereby cloaking his employee with apparent authority. And there are numerous cases under almost identical facts that say what that does is makes those charges authorized, not unauthorized. What's your position about the timeline involved here? Is it 90 days? Is it a year? And if so, on what do you rely? I rely under 15 U.S.C. 1666. I believe it's B1 that says you have 60 days to report a billionaire. The reason we go back 90 days is because you get a statement for covering 30 days, and at that point you go back 60 more. So we say 90 days. And you think that's the law that controls here, as opposed to California law? I believe that's the law. That puts a statutory obligation on credit card holders to review their statements and report unauthorized charges, absolutely. And if they don't do that, then the law is, under Minskoff and these other cases, you're cloaking your employee with apparent authority, and that those charges are no longer deemed unauthorized. I do want to address, and let me finish with my comments on why this is proper for summary judgment. Mr. Peters testified. I went through the billing statements with him after the new account was opened. I gave him every opportunity to say whether this was a legitimate charge or not a legitimate charge. I gave him credit for the payments that he had made, if he had made any. At the end of that discussion, he testified repeatedly that he agreed that he owed at least $1,600 in legitimate new charges that he never paid. That includes the Bank of America debit offsets, as it's called by counsel. The reality is the $16,000 in credits applied to those Bank of America debit offsets and wiped them out. Therefore, there was nothing reported from Bank of America. So was it correct that there was a negative report put out by Discover with respect to balances that were still disputed? I do not believe that's correct, Your Honor, because, well, first of all, we have to look under the FCRA, and the key issue is when an ACDV form was given to Discover, that's the time that's at issue. The first one that was given to Discover, it was reporting an amount less than $1,600 in legitimate charges. And at that point in time, I believe it was August of 2012, the account was reporting as current. Therefore, there was nothing derogatory reported. The second ACDV in January of 2013 reported a balance of, I think, roughly $500, which was far less than the $600 in legitimate charges that he admits he owed. And not to mention that, the account was reported as disputed. So the information was accurate. It wasn't inaccurate. And so at the end of the day, even if I understand that there's this question of, well, there were offsets and credits and debits and all that, but at the end of the day, it doesn't matter because there's no question. It is not disputed that at least $1,600 in legitimate charges were on that card that he simply never paid. He never paid it. And Discover never reported more than that or attempted to collect on more than that. At the end of the day, we're talking about a $500 issue. In the brief and throughout the argument, counsel talked about the ballpark estimate, and I just want to address that because it's incredibly misleading to the court. Ms. Miccioni was the PMK deposition witness for Discover, and what she was talking about when she said a ballpark is she had just quickly gone through the statements on the new account and added up what she saw as legitimate charges and said, I have a ballpark. It's about $1,300 that he's charged and not paid. So to say that Discover did a ballpark reinvestigation is just completely and utterly inaccurate. In terms of the verification issue which counsel raises, there's no question that Discover verified the information. Discover for two years looked at the account statements, got information from Mr. Peters and Mrs. Peters, attempted to reconcile charges that it believed it had a legal obligation to write off, and at the end of the day, the statements and the account notes reflect countless debits or credits to the account that accounted for the unauthorized charges. Counsel, let me change the focus here for a minute. I'm looking at the fact that Discover consistently reported a high balance of $12,791. That was, according to my notes, $5,791 over the plaintiff's $7,000 credit limit and resulted not from his going over the limit, but instead from the way Discover accounted for the plaintiff's bank refund request. That ballooned to $12,791 in the spring of 2011 when Discover charged back the refunds it made to plaintiff's bank as a result of the bank's fraud report. In that case, when you later canceled the vast bulk of those charges, you nevertheless failed to correct the credit reporting concerning the high balance. Do you agree with that? I don't agree with that, Your Honor. Here's the issue. The issue is the credit reporting occurs on a monthly basis. It's a snapshot of what's happening. And so Discover has an obligation to report what's on the balance. And it was in the process of continuing to work through this, and I believe at the time it wasn't reporting him derogatorily. It was adjusting the account based on the information that it was receiving. It was accounting for the information, and ultimately it was reconciling and verifying the account based on what it was agreeing to write off as unauthorized charges. So I believe that at all times it was accurate. So I guess I'm not following you. My understanding was that when he got the bank fraud report, it ballooned up. It ultimately got reversed. But is it your statement that Discover reported to the credit agencies that this had been clarified? No, what I'm saying is on a monthly basis, as Discover would make adjustments to the account, then it would be reported accurately as to what the account balance was saying. Okay, well, again, perhaps there's a mistake in the record, or I read it wrong, but it seemed to me that the record does not show that after the bulk of this fraudulent transfer, or not fraudulent transfer, the bank dispute was resolved, that there was nothing from Discover to the credit agencies saying this has been resolved, the amount now is X, which would have been well below the $12,791. Well, I think the later statements, and if we look at the time period of when the ACDD forms were sent, they should reflect a much lower balance. Can you give me a citation in the record where that occurred? I can, Your Honor. So if you look at the ACDD form in August of 2012. And where is that in the record? If you look at the, it's at Excerpt of Record 95, and this is the ACDD response in August of 2012, and it's actually on page 96, the second page of the form, and you'll see that there's a current balance that says $1,336. That's $1,336. Correct. And that reflects the balance, which was less than the $1,600 that was legitimately owed. And this ACDD form also shows that the account was being reported as current. And remember, it's Mr. Peter's burden to establish and show that there was something negatively reported that actually caused him damage. This doesn't do it. This just doesn't do it. Well, what, in your view, is the bottom line? The bottom line is I think the district court got it correct. There is nothing in the record that establishes, and they have not cited to a single unauthorized charge or improper credit reporting amount that Discover put forward that damaged Mr. Peter's credit. They haven't cited to a single thing. The reality is, based on his testimony and the record, it's clear that he owed Discover money. And Discover had actually given him the benefit of the doubt and given him credit that applied towards amounts he legitimately owed. If you took Mr. Peter's ---- What he's arguing, I gather, is that certainly he owed some money, but there were credits due him that had not been forwarded to him that exceeded the amount of money he owed Discover, and therefore Discover was wrong to report him delinquent. I think that's his position. That is the argument. And you answer that in which way? That's just not supported by the law. That's the argument. That's not supported by the law. Discover has an obligation to go back 60 days and credit charges that are timely reported as unauthorized. It went above and beyond that. It credited $16,000 when it had an obligation to credit $7,500. And if Mr. Peter's was correct, then what could happen is a cardholder could sit on their hands for four or five years, have an employee rack up $50,000 in unauthorized charges, then come to the bank and say, give me all that money back, or give me a credit so I can just go out and have a spending spree and charge $50,000 that you have to pay for. That is simply not the law, and there are all the cases we've cited under the Fair Credit Billing Act. In your view, what should our bottom paragraph say? In the opinion upholding summary judgment? Well, you can have your theory. The other side has its theory, but I'm curious to know what you think. The simple answer is summary judgment is appropriate because Discover never derogatorily reported Mr. Peter's in an amount greater than what he legitimately owed and which he admits he owes, and Discover never attempted to collect on any identity theft charges. But you see, summary judgment usually follows facts undisputed. Here they are, disputed facts, the other side would argue. There is no dispute, Your Honor, that, and maybe I should end on this, there's no dispute that Mr. Peter's admits that he owed, at the end of the day, after all the credits, at least $1,600 to Discover, and there's no dispute that Discover never attempted to collect on more than that or reported more than that. And I've actually pulled this as excerpts of Record 49. It's Mr. Peter's deposition testimony. I think this is very important. It's lines 14 through 21. Question. Okay, and as we calculated, there is at least $1,600 that was not paid, correct? Answer. Beyond 2010? Question. Right. Answer. Okay, yes. Question. Okay, so to the extent that was reported as delinquent, those were legitimate charges, correct? Answer. Yes. And then to follow up on excerpts of Record 54, also Mr. Peter's deposition testimony, lines 6 through 17. Question. Okay, we looked at statements earlier today, and you agreed with me that at least $1,600 in legitimate charges remain on your Discover card account, correct? Answer. Yes. Question. And as of today, there is $500 that shows as owing on the account, correct? Answer. That we see here today. Okay, yes. Question. Which is less than the $1,600 that you legitimately owe, right? Answer. Yes. Question. And you didn't make any additional payments on that $1,600, correct? Answer. Correct. So the only way that Mr. Peters can get to the conclusion that he wants is to establish that under the law, Discover had an obligation to go back to 2006 and credit him for all these charges that were made under his watch, and that's just contrary to what the law provides. And that's it, unless there's any questions, Your Honor. The $1,600 and $500, is that related to what the opposing counsel referred to as the time when Mrs. Peters had been told not to pay on the account? I do not believe so, Your Honor. The account notes that are also in the excerpts of record reflect that at one point in time they said, While we're wrapping this up, you don't have to pay it. We're going to try to figure it out. And credit extenders do that. I mean, this is not fairy tale stuff. Right. And then at a later point in time, after the reconciliation was done, they actually sent him a letter, I think it was in late 2011, that said the fraud investigation had been closed and there was an amount due in owing. Okay. Thank you. Thank you. I think the record is clear that Fred Peters was not the person to be answering any questions about the accounting in his office. Mary Peters was. And Mary Peters did very, very detailed declarations showing that the money was, in fact, owed by Discover to Fred Peters, number one. And number two, that it keeps making the reference to the $16,000 in credits that they gave to Mr. Peters, but they're somehow avoiding the $14,000 in debits. In short, they were giving and they were taking away all at the same time. This was a mishmash. This is a perfect case of the unverified prong of 1681S2B. So in your view, what should the Court's position be on this record? The Court's position should be, number one, that when the bank is incapable of verifying the account, the bank is not within its rights under the Fair Credit Reporting Act to report it as delinquent. You know what's so difficult about that? How can the bank know that an employee who appears to be authorized is stealing? On the record of this case, we have an employee from Discover Bank saying that the account is unverified. That's Mr. Jacks. And that's cited repeatedly in the record. Not every case that comes before you is going to have that record. We did the discovery. We did the depositions. Mr. Jacks said that he was incapable of calculating the penalties, the interest that should be added or removed from the identity theft charges, from the recognized identity theft charges. Mr. Jacks stated that this was an unverified account. And so therefore ---- Kennedy, I understand what you're arguing, counsel, and you're doing a good job about arguing it. But on this record, what we see is, and I don't know, I'm speaking only for a third of the Court. I don't know what we see, so I better say what I see. Okay. Is that there was a person stealing over a long period of time, but the person who was stealing over a long period of time was an employer, employee of your client. Right, exactly. So that the person in the better position to discover it, and I know you say that doesn't matter, was not discover. How could discover know? It's your client. And your client and his wife ended up with different views, didn't they, on this record? Well, my client was not the front office guy. I don't know. He was the mechanic out in the field. Paul, I'm asking you. You can tell me yes or no. On this record, didn't your client and his wife end up with different views of what was owed and what was not? The competent person who did the accounting, the wife, yes. That was a yes or no question. Can you answer that for us? Yes, Your Honor. Yes. Okay. There was a different point of view. Now, in terms of, you know, whether Discover Bank should know, what we have here is we have a police report. Not only do we have a police report, but we have a conviction on two counts. I mean, in short, there's a whole lot of freight. Well, in short, it appears to at least a third of the court that what you want to do here is put the onus on Discover Bank to do what your client and his wife could have done and possibly should have done. When Discover Bank has a conviction for identity theft, when Discover Bank has one of its own employees attempting an accounting and realizing that penalties and interest have been added on to identity theft charges, when Discover Bank sees in its own records that it is debited from Mr. Peter's identity theft charges that it has had to pay back to Bank of America, on the record of this case, there is plenty to go back to the district court. So I would say that there are violations here. There are violations that are the yes, Your Honor. Go ahead. I'm extending your time. I hope my colleagues will indulge me a moment. But again, going to one sentence to respond to what the opposing counsel said, what would you say is the false derogatory information that caused harm to his credit? I would say all the times that the account was reported as delinquent or charged off. Mr. Chauffer cites on one date, let me see, on July 14th of 2012, it was reported as closed never late at $1,336. There was no activity on the account after that. This is on page 16 of the opening brief. And how did it hurt his credit? I'm sorry? And how did it hurt his credit? Well, number one is he made loan applications for which he was denied. Number two, he testified that he refrained from making loan applications because his credit had been damaged. But if you look, I mean. Yes, I'm through with that. Thank you very much for your time. Thank you all. Thank you both. The case is argued and submitted.
judges: Sentelle, Farris, M. Smith